The MONTANA POWER COMPANY, a Corporation, Plaintiff and Appellant, v. PARK ELECTRIC CO-OPERATIVE, a Corporation, RASMUS BOE, TOM DURGAN, WALTON METIER, ALBERT OSEN, BERT GIBSON, FRED SASSE, and JAMES DUNN, as Trustees of Park Electric Co-operative, a Corporation, and W. H. SENNETT, as Manager of Park Electric Co-operative, a Corporation, Defendants and Respondents.

No. 10370.
Submitted March 13, 1962. Decided April 9, 1962.
Rehearing denied May 14, 1962.
371 P.2d 1.

James H. Morrow, Jr., Bozeman (argued orally), John C. Hauck and Samuel B. Chase, Jr., Butte (John C. Hauck, Butte, argued orally), for appellant.

William C. Wise, Washington, D. C., Landoe & Gary and Hjalmer B. Landoe, Bozeman (Joseph B. Gary, Bozeman, argued orally), Arnold Huppert, Jr., Livingston (argued orally), for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of the Sixth Judicial District Court of Park County. The judgment perpetually restrained the defendants from supplying electric service to any members or customers within the City of Livingston, including Star Addition, Unit One. The permanent injunction was made conditional upon the payment by the plaintiff of $19,412.60 to the defendants for certain underground installations because the plaintiff was found to be guilty of laches. The appeal is from that part of the judgment only which finds the plaintiff guilty of laches and required it to pay defendants for installations of certain improvements. No cross-appeal was taken and no cross-assignments of error made.

The plaintiff, appellant here, is the Montana Power Company, a public utility corporation generating, transmitting and distributing electricity in Montana subject to the jurisdiction and control of the Public Service Commission of Montana. For brevity the appellant will be referred to as the Utility.

The defendants, respondents here, are the Park Electric Cooperative and its trustees, officers and manager. The Park

Electric Co-operative is a rural electric co-operative membership corporation, organized and existing under Title 14, Chapter 5, R.C.M.1947, as amended. The respondents will be referred to as the Co-operative. The Co-operative was organized in 1938 and serves members in rural areas in Park County as well as other areas.

What might be termed the third actor, although not a party, is one Robert Weimer. Weimer is a building contractor and had been for about fourteen years in Livingston and surrounding areas. He lived in Livingston. In 1956 he acquired an eighty acre tract of pasture land immediately adjoining the City of Livingston for the express purpose of promoting a subdivision. In order to carry out his plan he needed sewer facilities and city water as well as utility service. He was a member of the city council during part of the time at least. He arranged for a city water connection, but the sewer had to wait until the City passed a bond issue to enlarge the sewer system. He planned to annex to the City to gain the benefits of city water and sewer if at all possible. In 1959 Star Addition, Unit One, was surveyed and platted as a subdivision. He formed the Star Land Company. In the plan for the development of the Star Addition, Weimer desired underground services for electrical service as well as television and telephone in order to preserve the view and aesthetic values.

To secure electrical connections, Weimer contacted local officials of the Utility. He also contacted officials of the Co-operative. The Utility informed him that it desired to serve his addition, but that it would be necessary for him to pay the difference in cost between the normal overhead service and his desired underground system, it being more expensive. The Co-operative, after studying the matter and having negotiations with Weimer, agreed to put in the service free of charge to Weimer.

It is at about this time when the situation developed bringing on this appeal.

Prior to 1959, and at all times involved, the Utility had an electric line along the south edge of the Star Addition and another line a short distance north and east of the Star Addition. Electric service was available at all times from either of these lines to any prospective user in the area which became Star Addition and the Utility was ready and willing to serve under its obligation as a public service company. Electric service would be furnished at the regular rates approved by the State Commission, but for underground service there would be an initial installation charge of an amount between $200 and $250 per customer, representing the difference in cost between underground and overhead construction.

Meantime, Weimer was negotiating for electric service with the Co-operative, without the knowledge of the Utility. The first dwelling in Star Addition was commenced in September 1959. On October 19, 1959, the Co-operative applied for a railroad crossing permit to service Star Addition from its lines which ran west from Livingston south of the highway and railroad tracks from the Star Addition. About this time, the Utility asked to meet with the Co-operative to discuss the matter and on October 21, the Utility informed the Co-operative that the Utility had a legal right to provide the service and the Co-operative did not. After several attempts to arrange a further meeting, one was held between representatives of the Utility and the Co-operative on November 30, 1959. On that day, the Utility had discovered that the Co-operative had built an overhead extension line from south of the highway and railroad tracks across both, and across the existing Utility line to serve the Star Addition.

At the meeting of November 30, a further meeting with the Board of Trustees of the Co-operative was arranged for December 12, 1959. Again the Utility informed the Co-operative that it had the sole right to service the Star Addition, and that the Co-operative had no legal right to service it and that the Utility, if necessary, would litigate to determine its right. The

Utility offered to buy the Co-operative's then investment in the extended overhead line. At that meeting another further meeting was arranged for January to further discuss the matter. Another meeting between representatives of the Utility and of the Co-operative was had on March 7, 1960, with the Utility again stating its position. During all of these inquiries, requests for meetings, negotiations and meetings there is nothing in the record to indicate that the Co-operative was going ahead with its plan to service, so far as the Utility was concerned.

However, in the meantime the Co-operative had entered into a written contract with Weimer to serve the Star Addition. The contract was designed to be for exclusive service by the Co-operative. It was signed by Weimer November 28, 1959, and by the Co-operative on January 18, 1960. No mention of this contract apparently was ever made to the Utility by the Co-operative. Also during the entire period Weimer was attending city council meetings working towards annexation.

On April 21, 1960, the Co-operative started to construct the underground installations to all of the building lots in Star Addition, some 38 of them, even though there was only one house at the time. The job was rushed through to completion, in spite of the warnings of the Utility, and finished on June 2, 1960. On June 6, 1960, at the instance of Weimer, Star Addition, Unit One, was annexed to the City of Livingston.

At that time, there was one dwelling in Star Addition, the first one having been started in September, 1959, by one Charles Bliler, who was an officer of the Star Development Company. The second house was started on July 29, 1960, by one A. R. Cool, the officer-manager of the Co-operative. A third house was started by Weimer after the institution of this suit. Weimer testified that the underground services increased the value of each building site by $300-$500. Each of the builders were aware of the service problem so that we are not herewith concerned with problems of the general public at all.

Witnesses for the Co-operative testified that this was the

first and only underground installation ever done by them and that it took much study, engineering, and securing of materials. It is obvious that all of these matters were being done by the Co-operative during their supposed negotiations with the Utility.

On August 1, 1960, the Utility filed suit to enjoin the Co-operative from serving the Star Addition.

The foregoing recitation of the situation which can be fairly gleaned from the record is set out to point up the issue on this appeal.

The District Court granted an injunction against the Co-operative, enjoining it from providing electric service in Star Addition, Unit One. The Co-operative took no exception to the judgment nor did it appeal as previously mentioned. The judgment went further to condition the injunction upon the condition that the Utility should pay the Co-operative the sum of $19,412.60 for its underground installations because the Utility was guilty of laches in not having instituted a legal proceeding to have a legal determination of the rights of the parties for a period of eight months after the declared intent as evidenced by the conduct of the Co-operative. The period of eight months was found by the trial court to have been from the action of the Co-operative in building its overhead extension line to Star Addition.

The Utility appeals from the judgment only as to that part conditioning the injunction on payment of the $19,412.60 to the Co-operative because of the Utility's laches. Our question then is as to laches. However, even though no exceptions to the findings and conclusions were made by the Co-operative and no cross-appeal or cross-assignments of error were taken, one preliminary matter argued by the Co-operative in its brief and on oral argument will be briefly touched upon.

■ This matter is (1) The Co-operative insists that the Utility had no capacity to sue, arguing that the Co-operative was only charged with doing an *ultra vires* act, and that only by action of the Attorney General could it be inquired into.

The trial court properly denied this attack; and even though we do not consider this an issue on this appeal, we do point out analogous holdings of this court stating clearly that the Utility does have standing to contest unlawful competition. See Northern Pacific Ry. v. Bennett, 83 Mont. 483, 272 P. 987; Stoner v. Underseth, 85 Mont. 11, 18, 277 P. 437.

R.C.M.1947, § 14-502, setting up the purpose of the Rural Electric Co-operative Act states:

"*Purpose.* Cooperative, nonprofit, membership corporations may be organized under this act for the purpose of supplying electric energy and promoting and extending the use thereof *in rural areas, in which electrical current and service is not otherwise available, from existing facilities and plants.* * * *" Emphasis supplied.

Under the facts of this situation and as found by the trial court, clearly the Co-operative did not have a right to serve Star Addition. It was contemplated, planned, promoted and organized as a subdivision to the City of Livingston. It was not, in contemplation of the rural electrification cooperative act, a rural area. In addition, the Utility had service lines on three sides of the area and electrical current and service was otherwise available. The trial court properly held that the Co-operative did not have a lawful right to service it.

In the face of this restrictive purpose and against the objections and warnings of the Utility, the Co-operative elected to proceed to contract to install, and then install, an underground electrical system, not just to the then applicant user but to the entire Addition. The only apparent explanation for this action is that it thought it could beat the formal annexation to the City of Livingston and thereby increase its revenues by one-sixth, if later the area actually did develop into electrically heated and serviced homes as hopefully dreamed by the promoter. It seems to be only a fair conclusion too, that all the while it continued to negotiate with the Utility, the Co-operative had

no other intention than to complete its installation, without informing the Utility.

It is observed that Montana's statute, section 14-502 is more restrictive than any similar statute in other states. It spells out the limits of the Co-operative service, restricting it to rural areas *and* where service is not otherwise available from existing facilities and plants. The Legislature has used restrictive language. The public policy declared is one for the Legislature and not for this court.

The above-recited statutory restrictions and limitations were recognized by this court in Sheridan County Electrical Co-Op. v. Montana-Dakota Utilities Co., 128 Mont. 84, 86, 270 P.2d 742, 743. In discussing the limitation of the Montana Act, this court said:

"Under the provisions of this Act the plaintiff has a right to provide electric energy to the designated rural areas. Nowhere in said Act, however, can one find anything which, by express words or by implication, indicates that the legislature intended to give an exclusive right to plaintiff to furnish electric energy in such rural districts. To the contrary, this plain wording of R.C.M.1947, § 14-503, indicates the opposite intention and limits the right of plaintiff to provide electric energy, in such rural areas, to certain users, section 14-503 providing: 'A cooperative shall have power: * * * (d) To generate, manufacture, purchase, acquire, accumulate and transmit electric energy, and to distribute, sell, supply and dispose of electric energy in rural areas *to its members, to governmental agencies and political subdivisions, and to other persons not in excess of ten per centum (10%) of the number of its members'*.

"Had our lawmakers intended that co-operatives should have the exclusive right to furnish electric energy in such rural areas, and thus prevent competition by other authorized electric public utility, they should have used clear and

apt words to so declare. Certainly, no such far-reaching right can be left to implication or inference."

Under our statute, and as pointed out by this court, the Co-operative had no lawful right to serve Star Addition in the instant situation. Therefore, we proceed to an analysis of the trial court's finding on laches.

The District Court concluded as a matter of law that the Utility was guilty of laches, setting forth as its basis that the Utility did not institute a legal proceeding "to have a legal determination of the rights of the parties hereto for a period of eight months after the declared intent as evidenced by the conduct of the defendant Park Electric Co-operative was made apparent." This conclusion was based on a finding of fact that: "[The Utility] had knowledge that the [Co-operative] had commenced construction of electric lines to serve the said Star Subdivision on November 30, 1959, but that suit was not commenced to enjoin [the Co-operative] until August 1, 1960, after all costs of installation had been incurred."

There is no statutory defense of laches in Montana. It is a creature of equity. This court has on numerous occasions discussed the doctrine. Recently in two cases, we have discussed the application of the doctrine. In Barrett v. Zenisek, 132 Mont. 229, 239, 315 P.2d 1001, and in Davis v. Steingruber, 131 Mont. 468, 470, 471, 311 P.2d 784, 785, we discussed laches. In the latter case, we said:

"Laches means negligence in the assertion of a right, and exists where there has been a delay of such duration as to render enforcement of the asserted right inequitable. Riley v. Blacker, 51 Mont. 364, 152 P. 758; Montgomery v. [First Nat.] Bank of Dillon, 114 Mont. 395, 408, 136 P.2d 760; Hynes v. Silver Prince Min. Co., 86 Mont. 10, 281 P. 548.

"As applied here, the respondent recorded his deed in 1942, wrote the treasurer about taxes due, used the land annually to graze sheep and built a road. Upon discovery,

in 1947, of the cultivation by appellants, he informed them verbally that he was the owner and intended to perfect title. It is true that thereafter, until January 1951, he did not file an action, but neither did the appellants who knew of his claim to title. * * *

"Neither was there any misleading act or silence or a change of position sufficient to invoke the doctrine of estoppel. The respondent informed appellants of his claim. Whatever appellants did, they did with full knowledge of his claim and intention to assert it."

The foregoing quotation applies to the situation here. The Utility protested to the Co-operative, made its position clear, and tried to negotiate even to the extent of purchasing the then improvements. The Co-operative, knowing a controversy existed, had every opportunity to bring an action to determine its legal position before either entering into the contract with Weimer or proceeding with the installation of any part of the system and particularly before proceeding with the underground facilities. R.C.M.1947, §§ 93-8901 to 93-8916 (Uniform Declaratory Judgments Act), provides at least one method for this. The conclusion is impelling that the Co-operative assumed the risk.

The rules announced by this court in our decisions on laches are summarized in 19 Am.Jur., Equity, § 498, p. 343, as follows:

"A suit is held to be barred on the ground of laches or stale demand where and only where the following facts are disclosed: (1) Conduct on the part of the defendant, or of one under whom he claims, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy, as, for example, an invasion by the defendant of the complainant's right, such as the right to the possession of property; (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit; (3) lack of knowledge

or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred.'' Emphasis supplied.

It appears too, that the continued meetings with the Utility by the Co-operative, had the effect of inducing the delay on the part of the Utility. The apparent negotiation for settlement of the controversy, holding out as it did to the Utility the hope of settlement without litigation, would be an additional factor. (See 30 C.J.S. Equity §§ 126, 127, p. 550.)

Still another factor has a bearing on the subject of laches as applied here. The Utility has been at all times willing to purchase the usable portion of the Co-operative's facilities. The Utility does not seek enrichment at the expense of the Co-operative. This willingness to buy, even at the Co-operative's cost rather than its own, has been re-expressed in the briefs on file in this appeal. The offer to buy is, of course, limited to the usable portion (now three installations) or that usable in the foreseeable future. The theory of unjust enrichment is applied by equity in cases where landowners sit by and let another make valuable improvements to the property. (See Hynes v. Silver Prince Mining Co., 86 Mont. 10, 281 P. 548. See also the doctrine recognized in Davis v. Steingruber, supra.) In the instant case, the improvements are not on property belonging to the Utility. It will acquire only those facilities which it purchases from the Co-operative so it cannot be enriched in any event. Rather than enrichment of the Utility, the only possibility here is loss to the Co-operative because of their gamble. They were certainly not mislead by the Utility. If and when the fond expectation of the Addition being built up occurs, even what now appears to be a loss may disappear or at least be lessened in amount.

We have examined the cases and authority cited by the Co-operative in its brief and find no authority under our restrictive

Montana law to the contrary of what we have herein stated. We find too that the equitable doctrine of laches relied upon by the District Court has no application here. The injunction granted by the District Court is affirmed, but that portion of the judgment finding the Utility guilty of laches and requiring it to pay for facilities constructed is reversed. However, in order to do equity in keeping with the expressed willingness of the Utility to buy the installations useable now and in the foreseeable future, the matter is remanded to the District Court for the fixing of the values of the installations and/or segments of installations useable to the Utility, and for such further relief as may be afforded to carry out the adjustment indicated. Such further relief to include retention of jurisdiction for a sufficient period of time to adjust the equities signified as involved.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES DOYLE and JOHN C. HARRISON concur.

MR. JUSTICE ADAIR dissents.