ROSE SCHANTZ, Plaintiff and Respondent, *v.* THOMAS MINOW and Farmers Insurance Exchange, a corporation, Defendants and Appellants.

No. 10633.

Submitted January 14, 1966. Decided February 14, 1966.
Rehearing denied March 15, 1966.
411 P.2d 362.

Lamey, Crowley, Kilbourne, Haughey & Hanson, Bruce Toole, (argued), Billings, for appellants.

Colgrove & Brown, Miles City, Hughes & Bennett, Helena, Ronald V. Colgrove (argued), Miles City, M. J. Hughes (argued), Helena, for respondent.

MR. JUSTICE ADAIR delivered the Opinon of the Court.

This is an appeal from a judgment of the District Court of the State of Montana, in and for the County of Custer, setting aside, nullifying and cancelling, as to the plaintiff, Mrs. Rose Schantz, alone, a certain general contract of release in writing that was agreed to, signed and delivered by both the plaintiff, Mrs. Rose Schantz and by her husband Mr. Casper Schantz, on one and the same day, for and in consideration of the payment and delivery to and receipt by them, on July 13, 1960, of a draft in the agreed sum of Three Hundred Sixty-three Dollars ($363.00) received by them and paid to them by Farmers Insurance Exchange, a corporation, being the insurer involved and the payor of said draft which was made, given, received and paid "in settlement of all claims arising out of accident or loss occurring on July 7, 1960" to either the plaintiff, Rose Schantz or to her husband Casper Schantz or to both the plaintiff and her husband. In the district court the case was tried before an advisory jury.

*First Collision.* On February 25, 1956, Rose Schantz was a passenger in a 1955 model Chrysler New Yorker Deluxe automobile, then owned and being driven by Casper Schantz, the husband of Rose Schantz. While stopped for a red traffic light at Main Street and Montana Avenue in Miles City, Montana, on the above date, Casper Schantz's Chrysler automobile was struck in the rear and damaged by an automobile owned by Edmund Scheuffele and then being driven by one, Victor Scheuffele. Edmund Scheuffele's insurance carrier was the aforesaid Farmers Insurance Exchange, a corporation.

According to Rose Schantz, she suffered a pulled rib in the above-described accident and collision with Edmund Scheuffele's automobile.

On August 20, 1956, being but five days short of six months after the aforesaid collision occurred, and after some thirteen visits made by Rose Schantz to a chiropractor, both Rose Schantz and her husband, Casper Schantz, signed and deliv-

ered to the insurer of Scheuffele's automobile, to wit, the Farmers Insurance Exchange, a corporation, by and through its claim's adjuster, R. A. McKinnon, one and the same written contract of general release, made on one and the same printed form supplied by the above-named claims adjuster, wherein and whereby both Rose Schantz and her husband, Casper Schantz, for and in consideration of the sum of $349.35 on that day, August 20, 1956, paid to them, did thereby "release, acquit and forever discharge [the insured], Edmund Scheuffele and Victor Scheuffele, driver, of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from accident that occurred on or about the 25th day of February, 1956, at or near Miles City, Montana."

At no time prior to reaching a settlement agreement with Rose Schantz, the wife, for her claim or claims against Edmund Scheuffele or his insurer, Farmers Insurance Exchange, did that corporation's established custom and practice permit its claims adjuster to effect a settlement with Casper Schantz, the husband, alone, for the damage done to his 1955 model Chrysler automobile or for any of his claims arising out of the accident and collision of February 25, 1956, with the Edmund Scheuffele automobile.

The general printed contract of release form signed on August 20, 1956, by both Casper Schantz and his wife, Rose Schantz, when settling all their respective claims for damages, injuries or loss sustained or claimed by either and both of them as occasioned by or resulting from said February 25, 1956, collision and accident, reads as follows:

## RELEASE
### In Full of All Claims

FOR AND IN CONSIDERATION of the payment to me/us at this time of the sum of *Three hundred and forty nine and 35/100* Dollars ($*349.35*), the receipt of which is hereby acknowledged, I/we, being of lawful age, do hereby release, acquit and forever discharge *Edmund Scheuffele and Victor Scheuffele Jr.* of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from accident that occurred on or about the *25th* day of *February*, 19*56*, at or near *Miles City, Montana*

I/we hereby declare and represent that the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite, and in making this release and agreement it is understood and agreed that I/we rely wholly upon my/our own judgment, belief and knowledge of the nature, extent and duration of said injuries, and that I/we have not been influenced to any extent whatever in making this release by any representations or statements regarding said injuries, or regarding any other matters, made by the persons, firms or corporations who are hereby released, or by any person or persons representing him or them, or by any physician or surgeon by him or them employed.

It is further understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of *Edmund Scheuffele & Victor Scheuffele* by whom liability is expressly denied.

This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

I/we further state that I/we have carefully read the foregoing release and know the contents thereof, and I/we sign the same as my/our own free act.

WITNESS *my* hand this *20th* day of *August*, 19*56* at *Miles City, Montana*

WITNESSES:

CAUTION: This is a release. READ IT before signing.

*Rose Schantz*

*Casper Schantz*

STATE OF ..............................

COUNTY OF ..............................  ss.

On this . . ... . day of ............ .... , in the year 19....... , before me, .. ............. , ............... .. ................., a Notary Public in and for the said County of............ ............... ............ .. .. ........ . , State of.... ..............................; personally appeared the above... .. ... ...... ........ .. .. ... ............ ., known to me to be the person named in and whose name is subscribed to the foregoing Release in Full of all Claims, and acknowledged that ........ executed the same as ........ free act and deed.

.......... ..........................................
*Notary Public in and for said County and State.*

My Commission Expires... ..... ......... .. .. .. ...... .......19.........

The face of the draft bearing date of August 20, 1956, which Casper Schantz and his wife, Rose H. Schantz both accepted, endorsed and cashed "in settlement of all claims arising out of accident or loss occurring on February 25, 1956," read as follows namely:

The reverse side of the above draft of August 20, 1956, bears the signatures of both Casper Schantz and Rose Schantz whereby each of said payees endorsed the draft immediately beneath the printed statement on the reverse side of the draft, which printed statement cautions, warns and informs, each payee who endorses the draft that by writing his or her signature beneath such printed statement, that the payee so signing thereby enters into a written contract and general release agreement of all claims, known or unknown, that the party who has thus signed has therefore had or claimed against the payor of the draft or against the payor's insured.

The above-printed statement, agreement and contract reads:

"Endorsement of this draft constitutes a release of all claims, known or unknown, the undersigned has or may have against the payor and any other person on account of any and all claims arising out of the loss referred to on the face hereof."

The complete reverse side of the above draft of August 20, 1956, is next shown whereon, of and in itself, is contained and set forth a valid and enforceable written contract and general "release of all claims, known or unknown" that either Casper Schantz or Rose Schantz then had against Farmers Insurance Exchange, it being the insurer and payor, of all the claims against Edmund Scheuffele, the insured.

The complete reverse side of the draft of August 20, 1956, which, when endorsed by the payees, presents a valid and en-

forceable printed contract and general release of all claims, known or unknown, is as shown below, viz.:

At the trial in the district court of Custer County in the instant cause, Rose Schantz testified that after she and her husband, Casper Schantz, had obtained a settlement of all of their claims for damages and loss claimed to be due to the injuries sustained by them in their first collision and accident, which occurred on February 25, 1956, with the Edmund Scheuffele automobile, she had to have "several" additional chiropractic treatments for her claimed injury subsequent to the signing of the general release, bearing date of August 20, 1956, by her husband Casper and by herself, and that she thereafter paid for her subsequent aforesaid chiropractic treatments out of her own pocket.

*Second Collision.* On July 7, 1960, at the same intersection at Main Street and Montana Avenue in Miles City, Montana, and while halted for the same red traffic signal, the Casper Schantz family car, then a 1956 Cadillac two door hardtop automobile was struck from the rear. The owner of such offending automobile involved in such second accident was the defendant, Thomas Minow, then residing at No. 509 South Sewell Street in Miles City, Montana, and who, oddly enough, was insured by the same Farmers Insurance Exchange, a corporation, which had insured the Edmund Scheuffele car that was involved in the collision that occurred on February 25, 1956.

As in the earlier accident and collision of February 25, 1956, at the time of the collision of July 7, 1960, Rose Schantz had been sitting in the front seat and on the passenger side of the Schantz family automobile which was then being operated and driven by her husband, Casper Schantz.

Rose Schantz testified that the impact in the more recent collision that occurred on July 7, 1960, was "very hard"; that pain shot through her body and that, as she stepped out of the Schantz Cadillac, she felt a numbness in the cords or muscles of her neck; that as a result of her claimed numbness and pain, she immediately sought chiropractic help, and by July 13, 1960, being the sixth day after the Minow automobile collided with the Schantz Cadillac, she, Rose Schantz, had received four treatments consisting of heat, massage, traction and an X-ray of her neck.

On July 11, 1960, Casper Schantz met with John L. Burghardt, a claims adjuster for Farmers Insurance Exchange, which was the insurer of the Thomas J. Minow automobile. On this occasion Mr. Burghardt, the claims adjuster asked Casper Schantz to obtain estimates on the cost of repairing the damage done to the Schantz Cadillac, at which time Burghardt, the claims adjuster, was informed by Casper Schantz that the latter's wife, Rose Schantz, had suffered some injury in such collision.

Two days later, namely, on July 13, 1960, Mr. Burghardt, the claims adjuster, went to the Casper Schantz home for the purpose of effecting, if possible, a settlement of all the claims arising out of the July 7, 1960, accident.

The testimony of Casper Schantz, Rose Schantz and John L. Burghardt concerning the conversation had in the Schantz home on July 13, 1960, is not in serious conflict.

It appears that the lowest estimate obtained by Casper Schantz on the cost of repairing the damage done to his Cad-

illac automobile—$163.00—was agreed upon as the amount to be paid Casper Schantz therefor.

Claims adjuster Burghardt next inquired as to the then condition of Rose Schantz, stating that in making a settlement of the claims presented by both the husband Casper, and the wife Rose, that he, the adjuster, was required to obtain the signatures of both the husband and the wife on any release in full of all claims of the couple, prior to the issuing and delivering of any draft in the payment of such claims, whereupon Casper Schantz informed the claims adjuster, that he, the adjuster, would have to talk to Rose Schantz concerning her then physical condition.

Upon inquiring of her as to her then condition, Rose Schantz told Burghardt that she had suffered a pulled muscle or cord in her neck, but that she was then feeling much better. All the parties apparently agree that on July 13, 1960, it was mutually assumed by Burghardt and by Mr. and Mrs. Schantz that Rose Schantz had suffered only minor injuries and that she then was well on the road to complete recovery.

As to the conversation had on July 13, 1960, which paved the way to the settlement of her claim on that date, Rose Schantz testified, on examination by her counsel, as follows:

"Q. Now, after he [Burghardt] got these [auto damage] estimates, did he ask you anything about medical bills? A. Yes. He wanted my medical bills.

"Q. He wanted to know the medical bills? A. Yes, that I had.

"Q. And did you have any? A. Well, I had some but I didn't know just how much they were. And he asked me how many times I went to the doctor. I told him four times. So he said the treatments were $4.00 a treatment. So then he asked me if I had any X-rays and I said, 'Yes.' and he said that they were $15 an X-ray.

"Q. Then that came to what? A. Thirty-one dollars.

"Q. Now, was there any discussion there about a whiplash? A. Yes, there was.

"Q. Now, did he make any mention to you about handling whiplash cases? A. Yes, he did. He said he handled many whiplash cases.

"Q. And did he say what happened to them? A. He said, they all turned out right.

"Q. Did he say what was done, that they turned out all right? A. He said—yes—a few chiropractic treatments.

"Q. They all— A. They all turned out right.

"Q. And you believed him did you not? A. Yes, I did.

"Q. Now, was that in the course of the time that you were trying to arrive at some figure? That was before you had signed the release, is that correct? A. Yes.

"Q. Did he indicate to you that that's what you had was a whiplash injury? A. Yes, he did.

"Q. Did he offer you this $31.00? A. Yes, he did.

"Q. And in response to that, did you say anything about the $31.00? A. Yes, I did. I told him that I had a previous car accident, and that the adjuster paid me for just my medical bills. Then I had to pay for some more bills for a few more treatments after that.

"Q. And what did he say as to that? Did he do anything about it—raising the amount or anything? A. Yes. He gave me one hundred and some dollars more and he told me that with a few more chiropractic treatments that I would be well

again, and that if I went to a lawyer I couldn't get any more anyway, so I may as well settle for that.

"Q. Well, did you make any suggestions to him that you were going to a lawyer or anything like that? A. No.

"Q. Did he say about this being enough or what would this amount constitute? A. He said that would be more than enough.

"Q. for what? A. For chiropractic treatments and I would be well.

"Q. And was it at this time that he told you he handled many of these cases and with a few chiropractic treatments they had all gotten all right? A. Yes, he did."

The total amount agreed upon to then cover Rose Schantz's claim was $200.00, being $169.00 more than the expenses that had then been actually incurred by Rose Schantz from July 7, 1960, the date of the accident, to July 13, 1960, the date whereon the claims of both Casper Schantz and Rose Schantz were paid and the general release of both the husband and wife was agreed to, signed and delivered to the payor, Farmers Insurance Exchange, a corporation, it being the insurer of the defendant, Thomas Minow.

Rose Schantz and Casper Schantz then signed a release on a form almost identical to that signed by them on August 20, 1956, with regard to the first collision and accident which occurred on February 25, 1956. In addition to signing the formal printed general release on the form supplied and employed by the insurer, Farmers Insurance Exchange, the claimant, Casper Schantz, wrote just above his signature on such general release, these words, namely: "I have read the above and realize I have signed a release."

The above general release given and made on July 13, 1960, reads as follows:

238

**RELEASE**

In Full of All Claims

FOR AND IN CONSIDERATION of the payment to me/us at this time of the sum of......................... *Three hundred sixty three and no/100* ...................... Dollars ($363.00), the receipt of which is hereby acknowledged, I/we, being of lawful age, do hereby release, acquit and forever discharge............ *Thomas J. Measer* ...................of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from accident that occurred on or about the.....7....th........ day of...*July*............., 196*0*., at or near...*Miles City, Montana*.................................................

I/we hereby declare and represent that the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite, and in making this release and agreement it is understood and agreed that I/we rely wholly upon my/our own judgment, belief and knowledge of the nature, extent and duration of said injuries, and that I/we have not been influenced to any extent whatever in making this release by any representations or statements regarding said injuries, or regarding any other matters, made by the persons, firms or corporations who are hereby released, or by any person or persons representing him or them, or by any physician or surgeon by him or them employed.

It is further understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of....*Thomas J. Measer*...................., by whom liability is expressly denied.

This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

I/we further state that I/we have carefully read the foregoing release and know the contents thereof, and I/we sign the same as my/our own free act.

WITNESS......... hand........ this *13* day of...*July*......., 196*0*, at...*Miles City, Mont.*...

WITNESSES:

CAUTION: This is a release. READ IT before signing.

STATE OF ............................................................ } ss.
COUNTY OF.............................................................

On this.............. day of................................................, in the year 19. ...., before me, ....................................... a Notary Public in and for the said County of.................................................., State of ......................................., personally appeared the above............................................................................, known to me to be the person named in and whose name is subscribed to the foregoing Release in Full of all Claims, and acknowledged that . . executed the same as .. ... free act and deed.

..........................................................................
*Notary Public in and for said County and State.*

D - 224 -

My Commission Expires.............................................., 19.........

Upon obtaining the above formal general release duly signed by both Rose Schantz and Casper Schantz, Mr. Burghardt, the claims adjuster, issued and delivered to Rose Schantz and Casper Schantz the draft of the Farmers Insurance Exchange for $363.00 payable to Rose Schantz whose claim was settled for $200.00 and payable to Casper Schantz whose claim was settled for $163.00.

The face of the draft of July 13, 1960, reads as follows:

The reverse side of the draft of July 13, 1960, which was endorsed by the payees, Casper Schantz and Rose Schantz, presents a valid and enforceable contract and general release of all claims known or unknown as is shown below, viz.:

At the trial of this cause in the district court, which commenced on November 29, 1962, the first person called to the witness stand by counsel for the plaintiff, Rose Schantz, was Albert Benoit, Jr., who was not called as an adverse witness, but as a witness for and on behalf of the plaintiff, Rose Schantz.

During the entire time he was on the witness stand, Albert Benoit, Jr., was interrogated only and throughout by the counsel for plaintiff, Rose Schantz, who asked of the witness Benoit, some thirty-six separate questions to each of which Benoit made answer.

Counsel for the defendants, Thomas Minow and Farmers Insurance Exchange, a corporation, asked no questions whatever of the witness Benoit, who became and was purely and simply the plaintiff's witness throughout his entire appearance on the witness stand.

The witness, Albert Benoit, Jr., testified that he then was the branch claims manager, and then in the employ of the Farmers Insurance Group consisting of five companies, one of which was the Farmers Insurance Exchange; that Benoit's office was then in Billings, Montana, where he then had five claims adjusters and three clerical personnel working under him; that on the 7th day of July 1960, claims adjuster John L. Burghardt then was, and, at the time of the trial in the district court on November 29, 1962, he (Burghardt) continued to be an employee of the Farmers Insurance Exchange; that the records that the witness Benoit then had with him at the trial showed that the Farmers Insurance Exchange, on June 18, 1958, initially issued to the defendant, Thomas Minow, a policy of liability insurance on Minow's automobile, which policy had thereafter been renewed from time to time; that such automobile insurance policy then covered bodily injury and property damage and that such policy was and is known as liability insurance; and that such insurance policy was in effect on July 7, 1960, being the date whereon the accident and collision here involved occurred.

Following the above recited testimony, plaintiff's counsel then propounded to the witness, Albert Benoit, Jr., the following interrogatories to which Benoit made answers as follows, namely:

"Q. But as I understand it, I think it was stated in the policy of the company to do that, though, if there is bodily injury and property damage simultaneous, particularly between husband and wife, you won't pay one unless they will take the other. Isn't that true? A. That is correct.

"Q. So that if you don't take the amount that's offered, for

instance, for personal injury, you wouldn't pay the property damage? A. That is correct, generally speaking.

"Q. And that is the hard and fast rule of the company, I presume. A. That is correct.

"Mr. Colgrove [Plaintiff's counsel] : We offer Plaintiff's Exhibit Number 1. [Said Exhibit being Thomas J. Minow's automobile insurance policy.]

"Mr. Toole [Defendant's counsel] : No objection.

"The Court: Admitted. It may be considered as read to the jury."

The plaintiff, Rose Schantz, is bound by the above testimony and answers given by her witness, Albert Benoit, Jr., in answer to the interrogatories so propounded to him by plaintiff's counsel.

Rose Schantz testified that about a week or two weeks after she had signed the general release of July 13, 1960, and received the draft from Mr. Burghardt, the claims adjuster, in settlement of her claims for the injuries which she had sustained, that she then experienced, for the first time, some pain between her shoulder blades, whereupon she went back to Dr. Wallick, a chiropractor, but she testified that she made no effort to inform Thomas Minow, the insured, of her then condition and gave, as her reason for such failure, this answer: "I didn't realize how severe it was. I just thought a few more treatments like he told me, I would be all right. So I went back for a few more treatments." However, it appears from the record that the discomfort of which Rose Schantz had complained before and at the time the general release of July 13, 1960 was signed, had disappeared.

Rose Schantz testified that for an indefinite period following the development of the new pain, which she had at no time experienced until "about a week or two weeks" being after she had signed the general release and had been handed the draft in full and complete settlement of her claim, she consulted another chiropractor.

According to Rose Schantz, the chiropractic treatments afforded her no relief, and she testified that under such treatments the pain "just got worse."

At this turn of events, Rose Schantz then went to and consulted with Dr. Berg, a physician in Billings, Montana, and in April 1961, she consulted Dr. Polk, a Miles City physician. Neither doctor was able to alleviate her affliction.

Next, in June 1961, Rose Schantz spent twenty-two days at the Mayo Clinic in Rochester, Minnesota. A letter from Dr. Ferguson of the Mayo Clinic to Dr. Polk, offered and admitted in evidence, succinctly reveals the nature of Rose Schantz's complaints, as follows:

"Dear Dr. Polk:

"Your patient, Mrs. Casper Schantz, has asked that I write you in regard to her recent examination at the Mayo Clinic. Since you are familiar with her recent problem of severe midthoracic pain centered at about D-6 and radiating around bilaterally to the anterior chest, I will not bother you with a recitation of the details of the history.

"We would demonstrate no physical abnormalities aside from consistent marked aggravation of the dorsal pain with neck flexion. * * *

"The urinalysis was unremarkable. Hemoglobin was 12 grams per cent and the leukocyte count 5,900. Flocculation test for syphilis was negative. The Westergren sedimentation rate was 38 mm. in one hour * * * Cerebrospinal fluid examination revealed negative serology, one lymphocyte and 23 mg. percent of protein. The pressures on fluid dynamics were unremarkable. Cervical, dorsal and lumbar spine x-rays and x-ray of the chest revealed no lesions. A pantopaque myelogram was done of the entire spinal subarachnoid space with negative findings. * * *

"For the primary problem of her back pain, Mrs. Schantz was seen by orthopedic, neurologic, and neurosurgical consultants. It was the consensus that this was an organic pain

problem suggestive of an intraspinal lesion. However, the negative myelogram and benign spinal fluid results indicated that further conservative therapy would be the only appropriate course of action at present.

"She was seen in the Department of Physical Therapy and received some baking and massage treatments. She was fitted with a Spencer Corset with a pelvic binder, rigid stays, and shoulder straps in the hope of providing her with better support to the painful area. She seemed to prefer Zactirin to other non-narcotic pain remedies and was taking one or two every three hours as necessary for discomfort. Unfortunately, her stay was protracted by the development of the severe post-puncture reaction with headache and nausea whenever she attempted to get up. This persisted for a week but had largely cleared by the time of her dismissal. Most of her back pain disappeared during the interval that she was down with the post-myelogram reaction. *I hope that she is over the worst of it and that it clears up without our ever knowing what produced it.* [Italics supplied.] An additional suggestion which was not acted on here was a trial injection of hydrocortisone into the inter-spinous ligaments between D-6 and 7. *If her trouble persists and it is necessary to carry out this procedure, I would be interested in knowing the results."* [Italics supplied.]

After her return from the Mayo Clinic, and following the death of Dr. Polk, Rose Schantz went to Dr. Freese for several treatments beginning in December 1961.

On July 6, 1962, Rose Schantz commenced this action against Thomas Minow and John Doe Insurance Company. The complaint was filed in the District Court for Custer County and it alleged two grounds for relief.

First, it was claimed that in obtaining the release, John L. Burghardt, the insurer's claims adjuster, "falsely and fraudulently represented to plaintiff as a positive fact, based on his experience as an adjuster, that after a few chiropractic treatments she would be all right and that her injuries were not

permanent or disabling * * * and also fraudulently and falsely represented to plaintiff that the insurance policy prohibited him from making any settlement or payment for the damage done to the car in which she was sitting unless she settled for her personal injuries at the same time and that $363 would be a fair and reasonable settlement for both plaintiff's cause of action for personal injuries and the damage done to the car."

Second, the plaintiff Rose Schantz, alleged that: "On July 13, 1960, plaintiff and Insurance Company came to an agreement for compromise and settlement and release of plaintiff's cause of action against defendant [Insured] by reason of the facts above alleged for the sum of approximately $200 to be paid to plaintiff, neither plaintiff nor Insurance Company then knowing that, rather than a slightly sprained neck, plaintiff has a serious nerve injury in her back, which was permanent, and both plaintiff and Insurance Company, acting under a common but mistaken belief that plaintiff's injuries were superficial and without knowledge of the facts and in ignorance of plaintiff's true condition."

The amended answer to the complaint alleged as an affirmative defense that: "Plaintiff is not entitled to a rescission of the release contract mentioned in her complaint for the reason that she is guilty of laches, and has failed to give timely notice of her intention to rescind and to restore to the defendants, or offer to restore to the defendants, the consideration paid her for the release."

The advisory jury, having had special interrogatories submitted to them, found for the plaintiff, Rose Schantz, on both grounds alleged in the complaint.

The judge of the district court rejected the advisory jury's finding of mutual mistake, relying upon Casey v. Proctor, (Dist.Ct.App.1962), 22 Cal.Rptr. 531, but next the trial judge made a finding to the effect that the written general release had been fraudulently obtained.

The judge of the district court also rejected the defense of

laches and made a finding that Rose Schantz the "plaintiff did not discover she had sustained a spinal cord lesion until June of 1961, and this action was commenced on July 6, 1962, but during the interim there were no material alterations in the condition and circumstances of the parties."

On this appeal, the appellants, Thomas Minow and the Farmers Insurance Exchange, a corporation, urge error in the finding of fraud by the judge of the district court, and also in his rejection of the defense of laches, and the respondent, Rose Schantz, has brought cross-assignment of error on the refusal of the judge of the district court to find mutual mistake, citing, as authority, the reversal of Casey v. Proctor, supra, by the Supreme Court of California, 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579 (1963).

We need not here decide whether or not it was error for the judge of the district court to make his finding of fraud or in his rejection of the claim of mutual mistake, for we are of the opinion that it is clear in the record before us on this appeal that Rose Schantz was and is guilty of laches in attempting to set aside the two general contracts of release in writing that were agreed to, signed and delivered by both the plaintiff, Rose Schantz, and her husband, Casper Schantz, on one and the same day for and in consideration of the payment and delivery to them on July 13, 1960, of an agreed sum of money, all of which they accepted and retained.

This court, on a number of occasions, has defined the doctrine of laches and outlined the general circumstances in which such defense is applicable. " 'Laches means negligence in the assertion of a right, and exists where there has been a delay of such duration as to render enforcement of the asserted right inequitable.' " Montana Power Co. v. Park Electric Coop., 140 Mont. 293, 301, 371 P.2d 1, 6 (1962), quoting from Davis v. Steingruber, 131 Mont. 468, 470-471, 311 P.2d 784 (1957).

It is true that the period prescribed by the legislature for

the commencement of an action for relief on the ground of fraud or mistake is within two years of the discovery of the facts constituting the fraud or mistake. R.C.M.1947, § 93-2607, subd. (4). However, the doctrine of laches is not dependent upon statutes of limitations. " 'The delay which will bar relief in equity is not necessarily measured by the period prescribed by the statute. It may be much less, depending upon the peculiar circumstances of the case, and in determining whether laches shall bar a particular claim it is proper to consider *whether a party or an important witness has died, and the party against whom the claim is asserted has been deprived thereby of important testimony, or whether the property involved has increased in value, or whether the property has passed into the hands of an innocent third party,* or whether the position of the parties is so changed otherwise that an injustice will follow a failure to apply the doctrine.' " Barrett v. Zenisek, 132 Mont. 229, 240, 315 P.2d 1001, 1007 (1957), quoting O'Hanlon v. Ruby Gulch Mining Co., 64 Mont. 318, 329, 209 P. 1062 (1922).

More recently, this court has declared:

"The rules announced by this court in our decisions on laches are summarized in 19 Am.Jur., Equity, § 498, p. 343, as follows: 'A suit is held to be barred on the ground of laches or stale demand where and only where the following facts are disclosed: (1) Conduct on the part of the defendant, or of one under whom he claims, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy, as, for example, an invasion by the defendant of the complainant's right, such as the right to the possession of property; (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit

is not held to be barred.' " . Montana Power Co. v. Park Elec. Co-op., supra, 140 Mont. at 302-303, 371 P.2d at 6.

We note that it is impossible to ascertain even approximately the date whereon Rose Schantz discovered the alleged facts on which she now relies and claims would impart knowledge of fraud or mistake. As previously observed, the district court found that the "plaintiff did not discover she had sustained a spinal cord lesion until June of 1961." This date is some eleven months after the general release of all claims "known or unknown" was given and made and the draft in full payment thereof was delivered and paid to Rose Schantz and Casper Schantz. Even if we were to assume that eleven months after the first general release was given, and the draft, with a general release on its reverse side, in settlement of all claims was delivered and paid and such period is sufficient to fix in point of time the date upon which the alleged nature of Rose Schantz's alleged injuries was first discovered or learned, for the purposes of a finding of mutual mistake, nevertheless it is readily apparent that such date cannot reasonably be claimed as that when the alleged fraud first became known to the plaintiff, Rose Schantz.

The gist of the alleged fraudulent statements was that the plaintiff, Rose Schantz, would completely recover after a few chiropractic treatments. However, it must be kept in mind that Rose Schantz testified that the pain was not alleviated by the chiropractic treatments that she had received, but rather that such pain "got worse." In fact, the record shows that Rose Schantz abandoned the chiropractic treatments and that she thereafter sought the aid of two medical doctors prior to journeying to the Mayo Clinic. Clearly then, any claimed fraud upon which Rose Schantz may now rely must have been manifest and apparent long before her journey to the Mayo Clinic at Rochester, Minnesota.

However, were we to assume, that the approximate date of June 1961, should adequately and for the first time set the date

that Mrs. Schantz first discovered the claimed fraudulent nature of claims adjuster Burghardt's alleged statements, as well as the date when any mistake of facts became known, (compare, Ott v. Pace, 43 Mont. 82, 115 P. 37 (1911).) Nevertheless it was not until some thirteen months later that Mrs. Schantz filed her original complaint in this action. Rose Schantz has offered no explanation whatever for such delay.

During the aforesaid thirteen months interim, neither the insurer, Farmers Insurance Exchange, nor the claims adjuster, John P. Burghardt, nor the insured, Thomas J. Minow, had even so much as an inkling that Rose Schantz was contemplating rescission. Rose Schantz freely admitted that she had made no effort whatever to contact either the said insurer, or its claims adjuster Burghardt, or the insured Thomas J. Minow, for the purpose of seeking a release from the settlement she had made with them, or for the purpose of renegotiating her settlement, nor did she even give any notice whatever to said insurer or to its claims adjuster or to Thomas Minow, the insured of her claimed troubles, and this, notwithstanding the fact that during such period of time, Rose Schantz was employed as a cashier and clerk at a motel in Miles City, Montana, known as the Red Rock Village and also known as the Red Rock Motel where John L. Burghardt, the claims adjuster, often stayed.

While Rose Schantz quit her job at the Red Rock Motel on or about the date that she left Miles City to go to the Mayo Clinic, still, from the time she first suffered her alleged steadily increasing pain between her shoulders to the date she terminated her employment at the Red Rock Village, there was not the slightest attempt made to inform Mr. Burghardt, the claims adjuster, that she had any fault whatever to find with any of the statements that he had made to her either previous to or during the time he was obtaining from her and her husband, the aforementioned general release of July 13, 1960.

Likewise, it must be noted that the plaintiff, Rose Schantz, made no offer to return to Mr. Burghardt, the claims adjuster, or to Thomas J. Minow, the insured, or to Farmers Insurance Exchange, the insurance carrier, the money or any part of the money she had received from Farmers Insurance Exchange, at any time prior to the filing on July 6, 1962, of her original complaint in the District Court of Custer County. See R.C.M.1947, § 13-905.

The plaintiff, Rose Schantz, contends that the doctrine of laches is inapplicable herein, and she relies upon the findings of the presiding trial judge in the instant case, to the effect that "there were no material alterations in the condition and circumstances of the parties," however, in Montana Power Co. v. Park Electric Co-op., supra, this court found "injury or prejudice to the defendant" to be a highly important, if not essential, element in determining the applicability of the doctrine of laches. See Brundy v. Canby, 50 Mont. 454, 148 P. 315 (1915).

Despite Rose Schantz's argument that all investigative procedures available to Farmers Insurance Exchange on and after July 13, 1960 (the date whereon the general releases were given and signed, and the draft for the payment therefor was delivered), are still accessible, we are of the opinion that considerable prejudice has been suffered as a direct result of her delay, her failure to act, and her failure to return the amount of money, or any part of it, which money she had received from the Farmers Insurance Exchange as "payment in full of all her claims against both the insurer and the insured."

As pointed out by the appellant, Farmers Insurance Exchange, in its briefs, it is common knowledge that memory dims with time, and that it is nigh on to imperative that witnesses be questioned as soon as possible, while the recollection of seemingly unimportant details is relatively sharp.

The cross-examination of Casper Schantz itself revealed that his memory had dimmed considerably in the interval between

the taking of the depositions of himself and of his wife in the instant case and the date of the trial of the plaintiff's case in the district court.

Again, it would appear from the record now before this court on the instant appeal that Rose Schantz's power of recall diminished to the point that it was necessary for her to bring her suit against the "John Doe Insurance Company," because in the duly verified complaint which she filed or caused to be filed on July 6, 1962, in commencing her action in the district court, she swore in count I of her complaint that:

"I. The defendant, John Doe Insurance Company, is a fictitious name and the true name is to this plaintiff unknown, and plaintiff asks when the true name is discovered that this complaint may be amended by inserting the true name of such defendant in the place and stead of the fictitious name. The defendant John Doe Insurance Company shall hereinafter be referred to as 'Insurance Company'."

Also, as seen from the cases cited above, "the death of one of the parties *or a material witness* is such a change of position warranting the application of the equitable bar—laches." Barrett v. Zenisek, supra, 132 Mont. 229, at p. 241, 315 P.2d 1001, at p. 1008.

The record reveals that Rose Schantz's attending physician from April 1961 to December 1961, Dr. Polk, died during the unexplained thirteen months of delay in the institution of this suit.

Dr. Freese testified that he first saw Rose Schantz on the 12th or 15th of December 1961, shortly after Dr. Polk's death.

It is apparent from the record that a major factor in any claim Rose Schantz may have against Farmers Insurance Exchange is the nature, extent, and cause of the alleged injuries of which she here complains. It goes without saying that the testimony of a doctor who was her attending and treating physician during a period of approximately ten months which followed the chiropractic treatments, and which both preceded

and followed her wholly independent examination and tests at the Mayo Clinic, would be highly material and of great importance and value, especially in view of the noncommittal nature of the Mayo Clinic report to Doctor Polk, now deceased.

In Randolph v. Ottenstein et al., 238 F.Supp. 1011, decided on March 8, 1965, the United States District Court for the District of Columbia, in considering a case, quite similar in many respects to the instant appeal, said in part:

"The principal question of law presented in this case is whether a person who claims to have sustained injuries caused by the negligence of another, and who has obtained a settlement of his claim and has given a general release, may thereafter repudiate the settlement, obtain a cancellation of the release and bring suit on the original claim on the basis that he was unaware of one of the injuries resulting from the accident, and if so, under what circumstances may this be done. * * *

"The plaintiff is a lawyer of many years experience at the bar, whose practice has been of a substantial character. He was injured in an automobile accident as a result of the defendant's negligence. He submitted a claim for property damage to his vehicle and for personal injuries, which he thought were of comparatively minor nature. At his demand his claim was settled by an insurance company that had insured the defendant against public liability. The settlement was substantially for the amount demanded by the plaintiff. He gave a general release. He later concluded that he had sustained further injuries which he had not previously discovered, and brought suit for damages, ignoring the settlement. The defendant pleaded settlement and release as an affirmative defense. * * *

"The evidence introduced at this trial may be briefly summarized as follows: On April 19, 1960, the plaintiff was driving an automobile on a highway in Montgomery County, Maryland. He stopped because of a red traffic light. The individ-

ual defendant was driving an automobile in the same direction behind the plaintiff's vehicle. Because of the defendant's momentary inattention the front of the defendant's vehicle hit the rear of the plaintiff's automobile.

"Two days later the plaintiff sent to the defendant an estimate that he had obtained of the cost of repairing his automobile, which amounted to $204.63. Enclosed with the plaintiff's letter was a detailed estimate prepared by a recognized automobile concern in the metropolitan area. In the meantime the plaintiff consulted his family physician, Dr. Lewis H. Biben. Representatives of the insurance company that carried liability insurance in behalf of the defendant, communicated with the plaintiff, apparently asking for more information. On May 23, the plaintiff wrote to the representatives of the insurance company showing that his out-of-pocket expenses for repairs to the automobile and physician's fees, and other matters amounted to $249.48. He stated that he was ready to discuss settlement and hoped that his claim could be adjusted promptly. Enclosed with this communication was a certificate from Dr. Biben describing in detail his diagnosis of the plaintiff's injuries. They were related to the plaintiff's neck, or as they were described by the physician, they constituted a cervical sprain. The doctor's statement indicated that the plaintiff had almost fully recovered.

"The plaintiff then waited until June 8th, and sent what might be called a follow-up letter to the representatives of the insurance company. He stated in part: 'It has been over two weeks since I gave you this information and to date I have heard nothing from you.' Again he said: 'Do you intend to try to effect a settlement of my claim? If not, I shall proceed to file suit. If I do not hear from you by June 15th, suit will be filed promptly thereafter.' Upon receipt of this letter, an employee of the representatives of the insurance company communicated with the plaintiff, who demanded a settlement of $400.00. A settlement of $399.48 was agreed upon. On June

10th, 1960, the plaintiff executed a general release, and on June 17th received a check from the insurance company for $399.48. Up to this point there is no dispute in the evidence.

"Plaintiff claims that on July 11th he developed severe pain in his back, that his doctor, upon examination, suspected the possibility of a ruptured disc and that a specialist, Dr. Arthur Morris, was called in. Shortly thereafter Dr. Morris performed an operation for the removal of the ruptured disc. The plaintiff claims that the ruptured disc was caused by the accident to which reference has been made. He seeks to sustain his contention by the testimony of Dr. Biben, who was called as a witness at this trial and who stated: 'I felt that his ruptured disc was due to the injury that he had sustained several months before in the automobile accident.' This opinion was weakened somewhat on cross-examination. The orthopedic surgeon, Dr. Morris, who performed the operation for the ruptured disc, did not support this view. In a report that he submitted to plaintiff's counsel in 1962, he stated: 'It is my impression that the cervical disc rupture was aggravated by his April 19, 1960 accident, and that his general osteoarthritic changes in the cervical spine predisposed him to this occurrence.' Dr. Morris testified at this trial, and in answer to a question stated that it was hard to establish any causal connection between the disc condition and the accident. Sometime later the plaintiff had an attack of hives and was hospitalized on that ground for a number of weeks. A neurologist, Dr. Shapiro, testified that there was a causal connection indirectly between the attack of hives and the accident in that the accident brought on an anxiety state, and the latter, in turn, caused the hives.

"Subsequently the plaintiff brought this action to recover damages, making no mention in his complaint of the prior settlement. As heretofore stated, the defendant pleaded settlement and release as an affirmative defense, which is now before the Court.

"It is not necessary to determine at this juncture whether the ruptured disc and the attack of hives were caused by the accident. All that is to be decided at this stage is whether the plaintiff should be permitted to assert this claim in the light of the prior release. * * *

"The amount for which the claim was settled was named and designated by the plaintiff. The plaintiff apparently later repented of his bargain and concluded that he had used bad judgment. He tried to repudiate the settlement and secure a cancellation of the release.

"This brings us to a consideration of the pertinent principles of law. The authorities are not always at unison. We must be guided in part by the weight of authority, and in part by principle. * * *

"First and foremost, the sanctity of contracts is one of the basic principles of all jurisprudence. It is one of the fundamental doctrines of Anglo-American law. If contracts were to be easily set aside and repudiated, one of the very bases of our law would be gone. In addition to the principle involved, there is a matter of policy that is very important in this connection. The law favors settlements, provided they are reached fairly. If releases and settlements were to be lightly ignored many defendants and many insurance companies representing them would be discouraged from ever settling claims for personal injuries, fearing that the cases might be reopened thereafter. This attitude would add much to the congested calendars of the courts. What is much more important, it would be detrimental to numerous claimants, especially those having small and reasonable claims. Many of them would be put to the delay and expense of prosecuting a lawsuit, whereas if prospective defendants felt that a settlement would not be lightly set aside, such claims might well be adjusted at an early stage. * * *

"* * * A contract may also be set aside for mutual mistake. On the other hand, a mutual mistake may not be lightly inferred. It must be established by evidence. A mutual mistake

must be a mistake reciprocally involving both parties, a mistake independently made by each party. In this instance, however, the defendant had no independent knowledge of the extent of the plaintiff's injuries. The defendant's source of knowledge was the plaintiff himself and the plaintiff's physician. The defendant accepted and acquiesced in the diagnosis and opinion of the plaintiff's physician. In other words, the mistake, if any, was made by the plaintiff alone and, therefore, was a unilateral rather than a mutual mistake. It must be remembered in this connection that settlement is a compromise and takes in all possibilities *pro* and *con,* past, present and future. The mistake, if any, was made by the plaintiff alone and he communicated his mistake to the defendant, who assumed that what the plaintiff represented was correct. Consequently the mistake is obviously unilateral. There is no mutual mistake.

"There are a multitude of authorities on this question. The Court will limit itself to referring only to a few typical decisions, since otherwise this opinion would be extended to an inordinate length. Thus, it was stated by the Supreme Judicial Court of Massachusetts, in Tewksbury v. Fellsway Laundry, 319 Mass. 386, 65 N.E.2d 918, 919:

" 'It is settled in this Commonwealth that one who executes a release for consideration for the injuries then known cannot, on the subsequent discovery of injuries not known or suspected at the time of settlement, obtain a cancellation of the release on the ground of mutual mistake, and that the release is binding in the absence of fraud or concealment.'

"The Superior Court of New Jersey, in Reinhardt v. Wilbur, 30 N.J.Super. 502, 105 A.2d 415, 416, ruled as follows:

" 'The question to be determined is whether a duly executed general release may be invalidated upon the ground of mutual mistake of fact merely because an injury subsequently becomes more serious than the releasor believed it to be, or because she sustained injuries of which she was not aware, at the time of

the execution of the release. The very suggestion of invalidation for such cause is contrary to firmly imbedded principles of law. We cannot shut our eyes to the realities of everyday practice. Persons involved in accidents or their representatives carry on and conclude negotiations precisely because there is uncertainty as to the extent of injuries or liability or both, and because of the uncertainty as to the outcome of any ensuing litigation. A general release duly executed and fairly obtained is a complete bar to further recovery for injuries sustained. Otherwise, the floodgates would open and not only persons like the plaintiff would seek avoidance, but also those who had paid substantial sums if supposedly serious injuries later proved to be minor.'

"Surely the plaintiff in this case would not contend that if there is a settlement for a substantial sum on the assumption that a very serious injury has resulted from an accident, the defendant would be able to set aside the settlement and recover back a part of the consideration if it later proved that the fears of a serious injury were unfounded. Yet the rights of the parties must be reciprocal. * * *

"It must be noted that the decisions of the Appellate Court of Illinois, which sits in separate divisions, are far from being at unison, for in Thomas v. Hollowell, 20 Ill.App.2d 288, 155 N.E.2d 827, 829, it reached an opposite result and enunciated the following principle:

" 'It has always been the policy of the law to favor compromise and settlement, and it is especially important to sustain that principle in this age of voluminous litigation, particularly in traffic cases. It must be remembered that the question of liability, besides the extent of the injuries, may well be in the minds of the parties. If a release, completely effective in the form in which it is executed, is to be lightly disregarded, then the peaceful settlement of claims out of court becomes practically impossible. How many prospective litigants negotiate a settlement if the law will not give effect to their signed ad-

justment, with consideration paid? This is a problem which would confront lawyers every day in this state.'

"A similar conclusion was reached by the Supreme Court of Oregon in Wheeler v. White Rock Bottling Company of Oregon, 229 Or. 360, 366 P.2d 527, in which the plaintiff thought that he had sustained a minor back injury but later the existence of a ruptured disc was discovered. A like conclusion was arrived at in Gumberts v. Greenberg by the Appellate Court of Indiana, 124 Ind.App. 138, 115 N.E.2d 504. The Court there pointed out, as is the situation here, that the mistake was unilateral and not mutual, since the plaintiff thought that his injury was healed and the defendant knew nothing of it, but relied upon the plaintiff's statement, and later further injuries developed. * * *

"The Court reaches the conclusion that there has been no mutual mistake and that the plaintiff is not entitled to secure a cancellation of the settlement and of the release."

As a result of the great delay in the bringing of this action, for which no satisfactory explanation has been or can be offered, the testimony of a most material witness on a critical point has been rendered wholly inaccessible.

Equity requires that Rose Schantz be denied any possible fruits, if any there be, of her inaction.

The judgment is reversed and the cause is remanded to the district court with instructions to dismiss the action with prejudice.

MR. JUSTICE DOYLE concurs.

HONORABLE PHILIP C. DUNCAN, District Judge, sitting in place of MR. JUSTICE JOHN C. HARRISON:

I concur in the result of the foregoing opinion in so far as it is reached through the application of the doctrine of laches.

MR. CHIEF JUSTICE JAMES T. HARRISON, specially concurring:

I concur in the result but not in all that is said in the foregoing opinion.

Appreciating that mere delay is not sufficient ground for the imputation of laches, it is my opinion that the doctrine must depend to a large extent on the facts in each case.

In my view, the essential facts here are that this accident occurred on July 7, 1960, the release was executed on July 13, 1960. Plaintiff testified that a week or two weeks after she signed the release a pain appeared in a different area of her body. She sought relief from another chiropractor and physicians in Miles City and Billings, then went to the Mayo Clinic in June of 1961. She never contacted or informed Minow, the adjuster, or the insurance company of any of her difficulties. In the latter part of January or in February of 1962, she consulted her attorneys and suit was filed July 6, 1962. Upon the trial, plaintiff offered no explanation for the delay. As disclosed by the fact situation set forth in the opinion of Mr. Justice Adair, the plaintiff was an intelligent woman, who had had a similar accident previously, and I think she should have acted with reasonable diligence after the new pain developed, and in any event immediately after her return from the Mayo Clinic in June of 1961.

HONORABLE FRANK I. HASWELL, District Judge, sitting in place of MR. JUSTICE CASTLES.

I concur in the foregoing special concurring opinion of Mr. Chief Justice Harrison.